## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**DIANA M. CRIST,**

        **Plaintiff,**

**v.**                                     **Case No.  8:06-cv-1587-T-26TBM**

**MICHAEL J. ASTRUE,**[1]
**Commissioner of the United States**
**Social Security Administration,**

        **Defendant.**

_____/

## REPORT AND RECOMMENDATION

      The Plaintiff seeks judicial review of the denial of her claims for Social Security disability benefits and Supplemental Security Income payments.[2]  Because the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence, I recommend that it be affirmed.

---

[1] Michael J. Astrue became Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue should be substituted for Commissioner Jo Anne B. Barnhart as Defendant in this suit.

[2] This matter comes before the undersigned pursuant to the Standing Order of this court dated August 28, 1987.  *See also* M.D. Fla. R. 6.01(c)(21).

I.

Plaintiff was twenty-eight years of age at the time of her administrative hearing in September 2005.  She stands 5' tall and weighed 110 pounds, down from her usual 135 pounds.  Plaintiff has a high school education and was in special-education classes.  Her past relevant work was as a floor associate with Wal-Mart.  Plaintiff applied for disability benefits and Supplemental Security Income ("SSI") payments in 2003, alleging disability as of March 1, 2002, by reason of an injury to her foot and knee, which resulted in pain and swelling, and a learning disability.  Plaintiff's applications were denied originally and on reconsideration.

The Plaintiff, at her request, then received a *de novo* hearing before an Administrative Law Judge ("ALJ").  The Plaintiff was represented at the hearing by counsel and testified in her own behalf.  Additionally, a vocational expert was called by the ALJ.

Plaintiff testified that she has not worked since March 2002 when she broke her foot while at a restaurant.  By her testimony, she has broken her foot twice.  The injury did not require surgery.  She claims that her condition prevents her from being able to stand or maneuver well enough to work.  While she broke her left foot, the fall twisted her right knee and it is this knee which keeps her from working.  She has been unable to obtain treatment, apart from some mental health treatment, because of a lack of insurance coverage and money.  An attempt to go back to work at Wal-Mart as a "greeter" failed after about one week.  At the time of the hearing, Plaintiff stayed at home daily caring for a ten-month old child.  By her account, her mother assists with this care as she finds it necessary to spend much of her day lying down or reclining due to pain.

Plaintiff described the pain in her knee when she injured it at a level ten on a scale of one to ten with ten being the highest degree of pain, and she indicated that the pain continues off and on.  She described the pain in her foot at a level five on the same scale.  By her account, her leg swells daily and she uses a prescribed knee brace.  She takes aspirin and lies down to help alleviate the pain.

Plaintiff also claims to suffer from depression.  By her account, she has suffered from depression her entire life.  Up until shortly before the hearing, she had received some care from a community health organization and had prescriptions for Zoloft and Trazedone.  At the time of the hearing, she was taking the medication only occasionally because her condition was not as bad as it had been.  Plaintiff claims the depression affects her energy level, concentration, focus, and memory, and she indicates she cries nightly and does not go out much.  She has difficulty sleeping.  Plaintiff estimated that she sleeps between 3:00 a.m. and 7:00 a.m.

According to Plaintiff, she cannot put much weight on her knee and foot without losing her balance.  She testified that she would be unable to sit for six hours at a job because she has to keep her knee up.  She estimated that she could stand for one hour and walk for one hundred feet.  She has a balance problem and she does not bend or stoop because she loses her balance.  Lifting a gallon of milk would put a strain on her knee.  Her mother does most of the household chores.  Plaintiff has no hobbies and does not read because it frustrates her.  She used to dance but can no longer do that because of her condition.  She denies driving.  She does cook small meals.

Plaintiff testified that she previously had received SSI benefits for a period of time prior to her working at Wal-Mart.  According to Plaintiff, the benefits were based on the fact that she was "slow" and had difficulty comprehending things, and they stopped when she went to work for Wal-Mart.  *See* Plaintiff's testimony (R. 266-85).

Next, the ALJ took testimony from Teresa Manning, a vocational expert ("VE"). The VE described Plaintiff's former work at Wal-Mart as light, unskilled work.  On an assumption of a younger individual with a high school education, precluded from performing all but sedentary work with a sit/stand option, with no foot pedal or hazards, no climbing, only unskilled and low stress job involving one and two step processes, and working with things rather than people, the VE indicated that such person could perform work as a ticket checker, lens inserter, and final assembler.  Upon further assumption that such individual's pain was so severe, and in combination with depression, that she could not stay on task one-third to two-thirds of the day, the jobs would be ruled out.  On a further assumption that an individual would have to lie down one hour in the morning and one hour in the afternoon of a work day, such jobs would be eliminated as well.  Upon questioning by Plaintiff's counsel, if such individual had a GAF score of 50,[3] typically, the resultant limitations would rule out gainful employment.  If such person was markedly limited in the ability to maintain attention

---

[3]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994) (DSM-IV).  A GAF of 41-50 indicates either "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*

and concentration, perform within a regular schedule, and had difficulty with memory, focus, and concentration, the jobs identified by the VE would be eliminated as well. *See* VE's testimony (R. 285-88).

Also before the ALJ were medical records outlining the Plaintiff's medical history. Although not well presented by the Plaintiff, they are set forth below in some detail.

By his decision of October 6, 2005, the ALJ determined that while Plaintiff has severe impairments related to borderline intellectual functioning, depressive disorder, status post left foot fractures, and soft tissue injury to the right knee with probable lax patella, she nonetheless had the residual functional capacity to perform sedentary exertional work that allowed for a sit/stand option and did not require climbing, the use of foot pedals, or exposure to hazards, and which was limited to unskilled, low stress work involving entry levels duties, one and two step instructions, routine and repetitive tasks, and dealt primarily with things rather than people. Upon this finding and the testimony of the VE, the ALJ concluded that Plaintiff could perform jobs available to her in the local and national economy. Upon this conclusion, the Plaintiff was determined to be not disabled. (R. 18-24). The Appeals Council denied Plaintiff's request for review.

## II.

In order to be entitled to Social Security disability benefits and Supplemental Security Income payments, a claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months. . . ."

42 U.S.C. § 423(d)(1)(A). A "physical or mental impairment," under the terms of the Act, is one that "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* at § 423(d)(3).

A determination by the Commissioner that a claimant is not disabled must be upheld if it is supported by substantial evidence and comports with applicable legal standards. *See id.* at § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)); *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996). The Commissioner must apply the correct law and demonstrate that he has done so. While the court reviews the Commissioner's decision with deference to the factual findings, no such deference is given to the legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).

It is, moreover, the function of the Commissioner, and not the courts, to resolve conflicts in the evidence and to assess the credibility of the witnesses. *Grant v. Richardson*, 445 F.2d 656 (5th Cir. 1971). Similarly, it is the responsibility of the Commissioner to draw inferences from the evidence, and those inferences are not to be overturned if they are supported by substantial evidence. *Celebrezze v. O'Brient*, 323 F.2d 989 (5th Cir. 1963). Therefore, in determining whether the Commissioner's decision is supported by substantial evidence, the court is not to re-weigh the evidence, but is limited to determining whether the record, as a whole, contains sufficient evidence to permit a reasonable mind to conclude that

the claimant is not disabled. *Miles*, 84 F.3d at 1400; *Bloodsworth v. Heckler*, 703 F.2d 1233 (11th Cir. 1983).

The scope of review is limited to determining whether the findings of the Commissioner are supported by substantial evidence and whether the correct legal standards were applied. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983).

III.

Plaintiff raises numerous claims on this appeal. As stated by the Plaintiff, the decision should be remanded and reversed for an immediate award of benefits because of the ALJ's (1) failure to give proper weight to the opinions of the treating mental health clinic; (2) failure to develop the record; (3) use of an incomplete hypothet; (4) failure to use the proper RFC definition; and (5) failure to follow 11th Circuit law on mental retardation and because the listing at 12.05 is met. Plaintiff also contends an award of benefits is warranted in light of new and material evidence that was provided to the Appeals Council and to this court. Plaintiff's memorandum also includes a separate motion for remand to consider new and material evidence.

In response, the Commissioner argues generally that Plaintiff has failed to establish that she was disabled by reason of an injury to her left foot and/or right knee, her learning disability, and depression. By the Commissioner's argument, the ALJ fairly evaluated the medical evidence and concluded that Plaintiff's conditions neither met the listings nor otherwise rendered her disabled from all work. The Commissioner maintains that the

7

hypothetical question employed by the ALJ was fully adequate to summarize Plaintiff's legitimate impairments and limitations.  The Commissioner urges that the additional evidence submitted by the Plaintiff either to the Appeals Council or this court is insufficient to warrant a remand.  According to the Commissioner, the evidence related to the prior period of disability and benefits and is irrelevant to the instant claim, which requires an analysis of the medical record for the period between March 2002, Plaintiff's alleged onset date, and October 6, 2005, the date on which the decision was rendered.  (Doc. 12).

A.

Before discussing the claims, a review of the medical record may be useful.  In summary, these records reflect that Plaintiff went to the hospital after a fall in a bar in December 2001.  She complained of left foot pain.  Ultimately, Plaintiff was diagnosed with a fracture to the third metatarsal bone of her left foot.  Records indicate that treatment was by way of pain medication, a splint, and crutches.  X-rays of the left ankle revealed no fracture, dislocation or abnormality.  (R. 128-35).  A few weeks later, at a different hospital, Plaintiff was still complaining of pain in her foot but no other injury.  (R. 142-44).  Earlier hospital records reveal that Plaintiff sought treatment for an injury to her left knee in August and September 2001.  Diagnoses included contusion, sprain, and internal derangement of the left knee.  X-rays demonstrated no fracture, dislocation, or intrinsic bone disease.  Joint space was maintained and the patella was intact.  (R. 136-41, 145).  In September 2002, Plaintiff was treated for complaints of pain in her right knee.  Clinical impression was for internal derangement of the knee and an immobilizer was provided along with crutches.  X-rays taken on September 30, 2002, indicated no evidence of fracture, dislocation, or joint effusion.  Joint

8

space was maintained without evidence of erosion or arthritic change and no soft tissue calcification was identified.  (R. 146-54).  In December 2003, Plaintiff sought care at another hospital for right knee pain.  She was assessed with a right knee strain, given an immobilizer and pain medications, and discharged with instructions to limit weight bearing.  (R. 192-200).

A consultative evaluation by C.N. Davey, M.D., in August 2003, revealed normal joints without deformity, pain, swelling, heat, redness, tenderness or signs of inflammation. Similar normal findings were reached upon examination of the spine.  The doctor's impression was probable lax patella to the right knee and below average IQ by speech pattern. Plaintiff declined to walk for the doctor without her brace.  (R. 159-60).  In July 2004, Plaintiff underwent another consultative evaluation by Firdaus Dastoor, M.D.  Plaintiff complained of right knee pain and an inability to completely bend the knee.  On exam, Plaintiff's extremities were essentially normal.  All muscles were noted to be firm, without atrophy.  Her right knee revealed no evidence of active inflammation and there was no tenderness.  There was mild clicking heard on movement.  Plaintiff could fully extend the knee but was limited in bending to 100 degrees.  All other joints were normal.  Dr. Dastoor indicated that Plaintiff's restricted movement of her right knee might be due to a torn cartilage and he recommended that she have an orthopedic evaluation.  (R. 218-22).

At a psychological consultative evaluation conducted by Linda Appenfeldt, Ph.D., in August 2003, Plaintiff described her disabilities as "slowness," as well as a problem with her right knee.  On mental status exam, she was found to be alert and cooperative; conversation was coherent, relevant, lucid, and goal directed; and her mood was within normal limits and affect was congruent.  Plaintiff evidenced no overt delusional material, formal thought

9

disorder, or anxiety.  There was no evidence of problems with thought productivity or structure.  Her memory appeared intact and her fund of knowledge was good.  Her judgment was deemed adequate for her personal safety.  The examiner noted a poverty of speech and spontaneity.  Intelligence testing revealed a verbal IQ of 72, performance IQ of 76, and full scale IQ of 72, placing her in the borderline range of intellectual functioning.  By Dr. Appenfeldt's assessment, Plaintiff's prognosis was fair.  (R. 161-68).

A later psychological evaluation by Peter Bursten, Ph.D., in April 2004, revealed similar conclusions.  This psychologist found no evidence of an underlying thought disorder or psychotic symptomatology, and Plaintiff's thinking was logical and goal directed, without evidence of inattention or distractibility.  Her memory appeared adequate.  Her affect/mood was fully appropriate.  On direct inquiry, Plaintiff denied feeling anxious or depressed.  The psychologist noted that Plaintiff communicated in a slow, simplistic, unsophisticated fashion. By this doctor's diagnostic impression, Plaintiff suffered borderline intellectual functioning. (R. 201-03).

In June 2005, Plaintiff reported relationship problems and depression at Suncoast Center for Community Mental Health.  Nursing notes reflect that she was initially given a GAF score of 51.  (R. 230).  At a follow-up appointment, she again complained of depression and difficulty sleeping.  On mental status examination, Plaintiff was cooperative and friendly, her speech was clear and moderately paced, and there was no abnormal psychomotor activity noted.  She was calm, minimally animated, thought content was logical and goal directed, as well as coherent.  Plaintiff denied hallucinations, appeared alert and oriented times three, she evidenced average intelligence, and her recent and remote memories were intact, although

recent was somewhat impaired.  She was unable to interpret proverbs.  She had good understanding and insight on the need for treatment.  She was diagnosed with depressive disorder with new onset of symptoms and given a GAF score of 50, and she was initiated on Zoloft.  (R. 227-29).  Three weeks thereafter, Plaintiff was again seen at the Suncoast Center for medication management.  She reported again of being depressed with little energy and was again suffering relationship problems with her boyfriend whom she described as very controlling.  The plan was to continue Plaintiff on the medications of Zoloft and Trazodone. (R. 226).

In December 2005, subsequent to the ALJ's decision in this case, Plaintiff was seen by Karl D. Jones, M.D., a psychiatrist who prepared a report for Plaintiff.  Dr. Jones noted on mental status that Plaintiff's speech was fluent, motor activity was appropriate, and affect was limited but thought processes were clear and coherent.  There was no evidence of psychotic, hallucinatory, or delusional content, and she was oriented times three.  Plaintiff's insight and judgment appeared limited, her intelligence average, her motivation fair, and her degree of stress severe.  By his assessment, Plaintiff's memory and cognitive functions were intact.  In the social and occupational functioning assessment, she scored in the area 51-60, suggesting moderate to severe impairment in social, occupational, and school functioning.  On a Mini Patient Health Survey, her scores were consistent with moderate depression and generalized anxiety.  By the doctor's impression, the Plaintiff suffered major depression.  At the time her GAF score was 55 and the doctor estimated over the last year it had been approximately 60. He recommended that she return to Suncoast Mental Health, medication would be helpful, and individual psychotherapy would be beneficial.  By his assessment, Plaintiff suffered mild

impairments in activities of daily living, moderate impairments in social functioning and adaptation, and marked limitations in concentration.  (R. 255-58).

Thereafter, Dr. Jones submitted to counsel a form mental residual functional capacity assessment dated March 2006, in which he assessed Plaintiff as markedly limited in most areas of psychiatric functioning and suggested his assessment related back to before October 6, 2005, the date of decision.  (R. 259-63).

Plaintiff's counsel submitted Dr. Jones's report and assessment to the Appeals Counsel in June 2006, along with a memorandum in opposition to the ALJ's decision.  (R. 237-63).

B.

Addressing the Plaintiff's "new evidence" claims first, upon consideration of the applicable standards and in light of the whole record, she is not entitled to relief on these claims.[4]  As noted above, Plaintiff raises two issues regarding so-called new evidence. Initially, she complains that the report and assessment from Dr. Jones is new evidence first submitted to the Appeals Council.  She also complains that these records were not even considered by the Appeals Council.  Further, Plaintiff argues that such evidence was material

---

[4]As the court docket reflects, the court previously granted an uncontested motion to stay the briefing schedule to allow for Plaintiff's previous claim file to be located and made a part of the record. *See* (Doc. 9).  Thereafter the Commissioner declined to supplement the transcript. *See* (Doc. 10).  However, the Commissioner forwarded at least a portion of that prior record to Plaintiff's counsel for submission to the court.  These records reveal that Plaintiff had been awarded a period of SSI benefits between May 1996 and January 2001 on the basis of mental retardation as revealed in school and childhood records.  Counsel appended those records to Plaintiff's memorandum along with the cover letter from the Commissioner explaining why the Commissioner was declining to make the records a part of the instant claim file. *See* (Doc. 12).  This and Dr. Jones' report and assessment comprise the so-called new evidence at issue in these claims.

to the issues and likely to alter the administrative result since Dr. Jones is a psychiatrist and he found Plaintiff markedly limited in a number of areas of mental and social functioning. At a minimum, Plaintiff urges that the case should be remanded for further evaluation by the Appeals Council, if not an award of benefits.

Plaintiff also maintains that she has attached "new evidence" to her memorandum to this court, which also satisfies the "new evidence" standard in this circuit and calls for a remand at minimum. By this argument, such evidence from Plaintiff's prior claim file was wrongfully withheld from the administrative record by the Commissioner and it constitutes new evidence material to the matter of her mental retardation on this claim. Plaintiff maintains that she timely requested that such evidence be made a part of the record before the ALJ but it was not. Again, she asserts that given applicable case law in this circuit, the evidence is material and warrants this court remanding the matter for an award of benefits based on what it reveals about Plaintiff's mental retardation.

Section 405(g) of Title 42 authorizes a district court to remand an application for benefits to the Commissioner by two methods, commonly denominated as "sentence four remands" and "sentence six remands." Each sentence "remedies a separate problem." *See Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1261 (11th Cir. 2007). When a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous. *Id.* at 1262. In essence, the Appeals Council's denial of a request for review in such circumstances is part of the "final decision" of the Commissioner and is subject to judicial review under sentence four. *Id.* at 1264. On the other hand, "[s]entence six of 42 U.S.C. section 405(g) provides the sole

means for a district court to remand to the Commissioner to consider new evidence presented for the first time to the district court." *Ingram ,* 496 F.3d at 1267.  Thus, under sentence six, a court may remand a case to the Commissioner "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g).  By this standard, to demonstrate that a remand for consideration of new evidence is appropriate, the Plaintiff must demonstrate that: (1) there is new, non-cumulative evidence; (2) the evidence is material, i.e., relevant and probative so that there is a reasonable possibility that it would change the administrative result; and (3) there is good cause for the failure to submit the evidence at the administrative level. *See Falge v. Apfel*, 150 F.3d 1320, 1323 (11th Cir.1998); *Caulder v. Bowen*, 791 F.2d 872, 877 (1986).

Here, Plaintiff first contends that the Appeals Council failed to even consider the new evidence from Dr. Jones.  She also contends that the evidence is material given the doctor's findings of "marked" limitations in a number of functional categories.  The record reflects that Plaintiff's memorandum and Dr. Jones' report and assessment were accepted by the Appeals Council for its review on July 27, 2006. *See* (R. 8).  On the same date , the Appeals Council denied Plaintiff's request for review.  In doing so, it indicated that, "[i]n looking at your case, we considered the reasons you disagree with the decision and the additional evidence . . . We found that this information does not provide a basis for changing the [ALJ's] decision."  (R. 5-6).  In light of this statement, I cannot agree with Plaintiff's initial contention that the evidence was not even considered.  The more serious argument is whether, under sentence *four,* the evidence renders the denial of benefits erroneous.  After

careful consideration, I conclude that it does not.  First, the witness's opinion on disability is one left for the Commissioner, not a one time consulting examiner.  Second, the opinion does not speak to Plaintiff's alleged mental retardation, which Plaintiff contends accounts for her disability.  Third, given the limited scope of this doctor's evaluation, the Commissioner was not obliged to afford the opinion considerable or controlling weight.  Here, the doctor saw Plaintiff on a single visit.  He considered only notes from a nurse practitioner and his own testing was limited.  Such as it was, it suggested only moderate depression with some generalized anxiety.  The doctor's own mental status evaluation was highly consistent with earlier assessments, and while it suggested some stress, it was otherwise essentially normal. He assessed Plaintiff with a "current GAF 55 over the last year approximately 60."[5]  By his conclusion, Plaintiff was only mildly impaired in activities of daily living, moderately limited in social functioning and adaptation, and markedly limited in concentration.  His later assessment finding Plaintiff "markedly" limited in no less than fourteen areas of functioning appears overstated in light of his report.  Finally, it cannot be overlooked that Plaintiff had worked for well over a year and only left her job when she injured her foot and knee. Plaintiff also fails to address the fact that the ALJ credited her with significant mental functional limitations because of her depression and borderline intelligence by limiting her to only unskilled, low stress work involving entry level duties, one and two step instructions, routine and repetitive tasks, and dealing primarily with things rather than people.  In light of

---

[5]A GAF of 51 to 60 means "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers),

the entirety of the mental health record, the Commissioner was not obliged to overturn the ALJ's decision or require a remand on the basis of Dr. Jones's report or assessment.

As for the claim that the new evidence submitted to this court requires a remand under sentence six, upon full consideration of the evidence and the arguments, I conclude that it does not. Simply stated, the records from Plaintiff's prior claim are not "new evidence" in contemplation of the new evidence standard discussed above, and while Plaintiff's history of mental retardation is certainly not irrelevant for consideration, the records are not "material" to the issues in this claim - in question here is Plaintiff's right to benefits for the period after her alleged onset date, March 1, 2002, through the date of decision, October 6, 2005. The fact that the Commissioner opted not to include the records in the hearing transcript is somewhat troubling, but Plaintiff cannot show real prejudice on this fact alone sufficient to warrant a remand. Despite any suggestion to the contrary, the Plaintiff, her counsel, and the ALJ were aware that Plaintiff had previously received a period of SSI benefits due to her intellectual impairment as Plaintiff testified to such. All were also aware that the benefits ceased when she went to work for Wal-Mart. Thus, even though the Commissioner declined to include the prior claim file in the record before the ALJ, Plaintiff was not precluded from fully developing her theory concerning the severity of her intellectual impairment before the ALJ. Similarly, counsel was well aware of the case law providing for a presumption of continued mental retardation at that time as well. In any event, given the period of time adjudicated in this case, the later psychiatric records showing a higher IQ and improved adaptability, and the Plaintiff's successful work history with Wal-Mart, the earlier findings are not material as such term is defined under the applicable standard because the presumption is rebutted by the later

16

circumstances and records.[6]  During the period of time adjudicated here, Plaintiff was assessed to have an IQ above the retarded range.  She had a successful work experience which ended only because of her physical injury.  On this record, the so-called new evidence before me is not material such that there is a reasonable possibility that it would change the administrative results and thus the claim and motion for remand are appropriately denied.

C.

As for Plaintiff's argument concerning the listing at 12.05, Plaintiff urges that she once met, and continues to meet or perhaps equals, the listing at 12.05 D by reason of her mental retardation.  By Plaintiff's argument, the record introduced here reflects that she received SSI benefits between 1996 and 2001 on an earlier claim.  The basis for the award was mental retardation.  Citing *Hodges v. Barnhart*, 276 F.3d 1265 (11th Cir. 2001), Plaintiff argues that there is a presumption that such condition remains constant throughout her life.  Despite the more recent IQ score of 72, which places Plaintiff outside this listing, Plaintiff argues that the higher score could have been the product of her learning how to take the test such that the new test scores are not valid.  Even assuming that Plaintiff's latest scores were valid, she maintains that there is no evidence to rebut that she is retarded.  Despite the contrary evidence of record, Plaintiff argues that this is not a case of borderline intellectual functioning, but one of mental retardation.  She urges that because she met the listing at

---

[6]It does not appear that Plaintiff ever challenged the decision to cease her earlier award of SSI benefits.  In this matter, Plaintiff has not argued that the decision to terminate her SSI benefits was in error or should be reopened.  Instead, she seeks to adjudicate a different period of time on a different record.

12.05D earlier in time, given the turn of events, including injury to her foot and her depression, she should be found still to meet or equal the listing at 12.05D or perhaps the listing at 12.05C.

The listing of impairments in the Social Security Regulations identifies impairments that are considered severe enough to prevent a person from engaging in gainful activity. By meeting a listed impairment or otherwise establishing an equivalence, a claimant is presumptively determined to be disabled regardless of her age, education, or work experience. Thus, an ALJ's sequential evaluation of a claim ends if the claimant can establish the existence of a listed impairment. *Edwards v. Heckler*, 736 F.2d 625, 628 (11th Cir. 1984). However, at this stage of the evaluation process, the burden is on the claimant to prove that she is disabled. *Bell v. Bowen*, 796 F.2d 1350, 1352 (11th Cir. 1986); *Wilkinson v. Bowen*, 847 F.2d 660, 663 (11th Cir. 1987). In this circuit, a plaintiff must present specific findings that meet the various tests listed under the applicable listing. Where the plaintiff claims an impairment that equals one of the listed impairments, she must present medical evidence which describes how the impairment has such an equivalency. *Bell*, 796 F.2d at 1353. Mere diagnosis of a listed impairment is not enough as the record must contain corroborative medical evidence supported by clinical and laboratory findings. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). To "equal" a listing, "the medical findings must be 'at least equal in severity and duration to the listed findings.'" *Wilson v. Barnhart*, 284 F.3d 1219, 1224 (11th Cir. 2002).

In *Hodges*, the court joined with several other circuits in recognizing that, "'[m]ental retardation is not normally a condition that improves as an affected person ages. . . . Rather, a

person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.'"  276 F.3d at 1268-69 (quoting *Muncy v. Apfel*, 247 F.3d 728, 734 (8th Cir. 2001)).  Thus, the court recognized that IQ test scores create a rebuttable presumption of constant IQ throughout life.  In *Hodges, r*ecognizing this presumption, the court held that it was unnecessary for Hodges to have presented evidence of mental disability prior to age twenty-two (under the listing at 12.05C) where she had presented evidence of such after that age.  The case was reversed for further proceedings applying this presumption but with the admonition that the burden remained with the claimant to prove entitlement to benefits.  *See Hodges*, 276 F.3d at 1269.

Under the Listing of Impairments, mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22.  The required level of severity for the impairment is met when the additional criteria in any one of four subsections is also met.  Here, Plaintiff urges that she should be found to meet or equal the listing at 12.05D, essentially because she once met the criteria for mental retardation and it is presumed that she still does.  She urges that the evidence of her successful work interlude and subsequent full scale IQ of 72 upon testing are insignificant and, in essence, should be ignored..  After careful consideration, I am obliged to conclude that the Commissioner's conclusion on the listings is consistent with the applicable standards and supported by more than a scintilla of evidence such that it must be affirmed..

The listing at 12.05D requires a valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following: (1) marked restriction of activities of daily living; or (2) marked difficulties in maintaining social functioning; or (3) marked

difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of an extended duration.  Here, the evidence from Dr. Appenfeldt established a verbal score of 72, a performance score of 76, and a full scale IQ score of 72 on testing in August 2003.  This alone permitted the ALJ to conclude that Plaintiff did not meet the listing.  Beyond any questions surrounding her IQ scores, Plaintiff did not and does not demonstrate that she met the other criteria of this listing.  Here, apart from the latter assessment from Dr. Jones, the record dictates a contrary conclusion.  As pointed out above, the conclusions by this doctor, when considered in light of the whole of the mental health record, need not be fully credited.  Thus, given the circumstances of this case, the presumption relied upon by Plaintiff is overcome by contrary evidence indicating an improvement in intellectual functioning and a period of employment evidencing Plaintiff's improve adaptability and ability to perform full-time work.  Plaintiff does not establish that she met or equaled this listing.[7]

### D.

Plaintiff complains that the ALJ failed to give proper weight to the opinions set forth in records from a treating mental health clinic.  More particularly, Plaintiff complains that the ALJ did not fully credit the assessment by a nurse practitioner from Suncoast Community

---

[7]The reference to Dr. Sorensen's 1999 report is unavailing given the later psychiatric evidence and work history.  Insofar as Plaintiff vaguely suggests that she might also meet the listing at 12.05C, that listing requires a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.  Once again, I am required on this record to affirm the ALJ's conclusion that Plaintiff did not meet that listing either.  While she did have an additional physical injury and suffered from life-long depression, she cannot meet the listing and makes no effort to establish her equivalence suggestion either.

Mental Health Clinic who saw Plaintiff on three occasions and assessed her with a GAF score

of 50.  Although the examiner was a nurse, Plaintiff urges her opinions were entitled to

substantial weight based on her treating relationship.  She urges that there was no legitimate

reason offered by the ALJ to discredit this medical opinion, which ultimately was buttressed

by the opinion of Dr. Jones, a psychiatrist.

Upon my review, the ALJ gave full and fair consideration to Plaintiff's depression as

well as the whole of the mental health record before him, including the GAF scores assessed

by this nurse at the Suncoast Community Mental Health Center.  He also fairly considered the

import of the scores.[8]  (R. 20).  Despite Plaintiff's urging to the contrary, under the applicable

regulation and standard, the opinions of this nurse practitioner were not entitled to deference,

only to fair consideration, which they here received.  *See* 20 C.F.R. §§ 404.1513(d),

416.913(d).  As the decision reflects, in assessing the longitudinal view of Plaintiff's

depression, the ALJ concluded that the condition was not as severe as suggested by the nurse

for the short period of time she saw the Plaintiff and there was no evidence that it would

remain as severe for a continuous period of twelve months.  In drawing this conclusion, the

ALJ considered Plaintiff's own complaints and testimony, as well as the entire medical

---

[8]At her initial appearance at the clinic, Plaintiff reported she was having relationship problems with boyfriend and was feeling depressed.  The interviewer assessed Plaintiff with bipolar d/o II, learning d/o, and a current GAF of 51.  As noted above, such a score suggests moderate symptoms or difficulties.  In two follow-up sessions, a nurse practitioner assessed Plaintiff to be suffering from depressive d/o and on each occasion a GAF score of 50.  A GAF of 41-50 indicates either "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  Plaintiff was prescribed medications and encouraged to continue with counseling.  The lack of records thereafter suggest she did not do so.

record.  The ALJ specifically noted that Plaintiff made no claim to either of the consultative psychological examiners that she was depressed, and in the case of Dr. Bursten, upon direct questioning, she denied being either depressed or anxious.  At her hearing, she testified that she was not taking the medication prescribed for her at Suncoast because she was not as depressed as she had been.  While crediting Plaintiff with some very significant limitations in connection with her mental functioning, upon his examination of the entirety of the mental health record, the ALJ concluded that Plaintiff's mental impairments, at most, imposed moderate limitations in her activities of daily living, social functioning, or concentration, persistence or pace.  It is not for this court to examine these matters *de novo*, and upon my review, we are obliged to conclude that the ALJ's conclusion was reached in a manner consistent with the applicable standards and is supported by substantial evidence.  To the extent that Plaintiff urges that the GAF scores assessed by the nurse practitioner were later bolstered by Dr. Jones, his report reveals the contrary.  By his assessment, made only five months later, Plaintiff had a GAF score of 55 and over the preceding year a score of 60.[9]

E.

Plaintiff complains that the ALJ failed to fully develop the record on this claim by failing to order an orthopedic consultative evaluation of the injury to her right knee.  By this

---

[9]It is worth noting that a low GAF score does not equate with disability.  *See Seymore v. Apfel*, 131 F.3d 152, at *2 (10th Cir. 1997) (unpublished table decision) ("Contrary to claimant's contention, a GAF rating of 45 may indicate problems that do not necessarily relate to the ability to hold a job; thus, standing alone without further narrative explanation, the rating of 45 does not evidence an impairment seriously interfering with claimant's ability to work"); *accord Cox v. Apfel*, No. 99-2296-JWL, 2000 WL 1472729, at *9 (D. Kan. Feb. 24, 2000).

argument, the ALJ was fully aware that Plaintiff claimed she had been unable to return to work due to pain in her right knee and that she had no funds with which to obtain treatment. Further, the record contained a report from consulting examiner, Dr. Dastoor, who examined Plaintiff in July 2004 and noted that she needed an orthopedic evaluation and arthroscopic surgery due to his suspicion that she had torn cartilage in her right knee.  *See* (R. 221).  On this report, Plaintiff urges that the ALJ was obliged to order the additional consultative evaluation of her knee by an orthopedic doctor.

Plaintiff is undoubtedly correct that the ALJ has a basic duty to develop a full and fair record.  *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003).  This obligation exists whether or not the claimant is represented by counsel.  *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981).  In light of this obligation, an ALJ must order a consultative examination when "such an evaluation is necessary for him to make an informed decision."  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988) (quoting *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984)); *see also Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999).  Nonetheless, it is the claimant's burden of proving that she is disabled and she is responsible for producing evidence in support of her claim.  *See Ellison*, 355 F.3d at 1276 (citing 20 C.F.R. § 416.912(a), (c)).  Further, case law in this circuit requires the Plaintiff to show some prejudice before a remand to the Commissioner for further development is ordered.  *See Graham*, 129 F.3d at 1423.  In considering whether a remand is required, the court should be guided by whether there are evidentiary gaps in the record that result in unfairness or clear prejudice.  *Id.*

Here, I conclude that the record evidence concerning Plaintiff's knees was adequate to permit the ALJ to make an informed decision even in the absence of such additional examination.  As the decision reflects, the ALJ credited Plaintiff with a soft-tissue right knee impairment.  In his view, the impairment was sufficiently limiting as he restricted Plaintiff to sedentary jobs, with a sit/stand option and no foot pedals or hazards and no climbing.  On a hypothetical assuming such limitations, the VE identified specific sedentary jobs available to the Plaintiff.  Even if  Plaintiff's injury should be labeled as torn cartilage as opposed to a lax patella or internal derangement or mere sprain of this knee, as it is elsewhere in this record described, there is no harm to Plaintiff here absent a showing that the ALJ failed to fully assess the resulting functional limitations.  The ALJ expressly recognized a soft-tissue injury to the knee and that it resulted in significant functional limitations.  Even by Dr. Dastoor's report, the limitations credited by the ALJ were generous.[10]  The record before him was more than adequate to permit that decision and Plaintiff fails to demonstrate that the ALJ needed more information to make the decision or that she was otherwise prejudiced by the lack of another examination.

F.

Plaintiff next urges that the ALJ failed to use the proper definition of residual functional capacity in this decision.  By this argument, the ALJ used an incomplete definition as evidenced by the fact that he made no express mention of the requirement that the person be able to perform substantial gainful activity on a sustained basis, meaning eight hours a day,

---

[10]Apart from some limitation in flexion of the right knee, Dr. Dastoor's findings are relatively normal across his full examination.

five days a week, or an equivalent work schedule.  Plaintiff urges that she is unable to

perform substantial gainful activity on a sustained basis and is entitled to benefits.

The decision reflects that the ALJ defined "residual functional capacity" ("RFC") by

citation to the regulatory provisions at 20 C.F.R. §§ 404.1545 and 416.945 and according to

Social Security Ruling 96-8p.  Under that ruling, at step five of the evaluation process, RFC

means the ability to perform work on a regular and continuing basis, meaning 8 hours a day,

for 5 days a week.  SSR 96-8p, 1996 WL 374184, *2 (S.S.A.); *see Kelley v. Apfel,* 185 F.3d

1211, 1214-15 (11th Cir. 1999).  In these circumstances, where the ALJ has cited the

applicable regulations and interpretive ruling, I am unable to agree that the ALJ employed the

incorrect definition of RFC.  On the contrary, I must conclude that the ALJ fully understood

the definition of RFC at step five of the evaluation process and employed the proper

definition in reaching his conclusion.[11]

G.

Finally Plaintiff complains that the ALJ failed to expressly mention her borderline

intellectual functioning in the questioning of the VE.  As a result, she contends that the

hypothetical question propounded to the VE was inadequate and incomplete and any

testimony by the VE cannot form the basis for the ALJ's conclusion.  Additionally, Plaintiff

urges that she has a long history of difficulty "concentrating and thinking and organizing her

---

[11]It is worthy of note that counsel represented the Plaintiff at the administrative
hearing and was granted a full opportunity to propose his own RFC based on the evidence and
fashion his questions with both his client and the VE.  While he no doubt knew the proper
definition of RFC at step five of the evaluation process, he too apparently found no need to
include it in his questions to the witnesses.

thoughts and keeping track of things," and given her GAF scores of 50 and the VE's testimony concerning the import of such, a remand is warranted for an award of benefits.

Case law in this circuit requires that the ALJ employ hypothetical questions which are accurate and supportable on the record and which include all limitations or restrictions of the particular claimant. *Pendley v. Heckler*, 767 F.2d 1561, 1562-63 (11th Cir. 1985). Where the hypothetical employed with the vocational expert does not fully assume all of a claimant's limitations, the decision of the ALJ, based significantly on the expert testimony, is unsupported by substantial evidence. *Id.* at 1562 (quoting *Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980)).

Here, Plaintiff urges that the ALJ's hypothetical question "left out" a severe impairment, namely, her borderline intellectual functioning. By this argument, Plaintiff's mental condition attributed to greater problems concentrating, thinking and keeping track of things than accounted for by the ALJ. She urges that absent a full accounting of her mental limitations, the testimony of the VE is inadequate to support the vocational conclusion by the ALJ. Because I conclude that the record supports that the ALJ properly assessed Plaintiff's mental functional limitations and he adequately accounted for her limitations in his hypothetical, I find no basis for relief on this claim.

Initially, the mere failure to identify Plaintiff's borderline intelligence in the hypothetical question is not cause to order relief. Under the applicable standard, the ALJ must include all *limitations* or *restrictions* of the particular claimant in his hypothetical to the VE. Here, the ALJ included limitations of "unskilled and low stress jobs, defined as one and two step processes, routine and repetitive tasks, primarily working with things rather than

people, entry level." (R. 285).[12]  It is these limitations and the ALJ's conclusion that the

Plaintiff was only moderately limited in activities of daily living, social functioning, and

concentration, persistence or pace and was without periods of decompensation, that the court

looks to under the applicable standard.  By my consideration, the medical record and

Plaintiff's own testimony concerning her successful work at Wal-Mart supported the

moderate limitations assumed by the ALJ.  The limitations included in the hypothetical are

adequate in light of those matters and Plaintiff does not demonstrate otherwise.  It is not

insignificant that counsel for the Plaintiff had a full and fair opportunity to ask the VE

hypothetical questions as well and indeed, he did.[13]  Thus, even assuming the ALJ's questions

were inadequate, it is hardly cause to remand the case if counsel duly filled in the blanks.

Here, what counsel really complains of is that the ALJ did not adopt his argument and the

questions propounded thereon, that Plaintiff was more severely limited.  Ultimately, however,

the ALJ rejected that Plaintiff's mental state was as significantly impaired as a GAF of 50

would suggest and he likewise rejected the marked limitations proposed by the Plaintiff.

Under the applicable law, an ALJ need not include findings/limitations in his hypothetical

question that he has properly rejected as unsupported.  *See Crawford v. Comm'r of Social

Security*, 363 F.3d 1155, 1160-61 (11th Cir. 2004).  Here, the marked limitations suggested

---

[12]He also inquired of the vocational import if Plaintiff's pain and depression were such that she would be limited in staying on task for up to two-thirds of the day.

[13]As noted above, counsel ask about the import of a GAF score of 50 and whether marked limitations in attention and concentration, and the ability to perform within a regular schedule and with difficulty focusing would alter the vocational opinion, to which the VE responded affirmatively.  (R. 286-87).

by counsel were not supported by the record as a whole, and the ALJ's failure to include them in his hypothetical question does not constitute reversible error.  Thus, Plaintiff is not entitled to relief on this claim.

IV.

While I am not unsympathetic to the challenges Plaintiff faces, the decision of the Commissioner of the United States Social Security Administration is in accordance with the correct legal standards and is otherwise supported by substantial evidence.  I recommend that it be affirmed.  I further recommend that the Clerk be directed to enter Judgment in favor of the Defendant and to close the case.

Respectfully submitted this
11th day of March 2008.

THOMAS B. McCOUN III
UNITED STATES MAGISTRATE JUDGE

<b><u>NOTICE TO PARTIES</u></b>

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days from the date of its service shall bar an aggrieved party from attacking the factual findings on appeal and a *de novo* determination by a district judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; M.D. Fla. R. 6.02; *see also* Fed. R. Civ. P. 6; M.D. Fla. R. 4.20.

Copies furnished to:
The Honorable Richard A. Lazzara, United States District Judge
Counsel of Record